Filed 7/29/14  In re B.R. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re B.R., et al., Persons Coming Under the Juvenile Court Law. | D065457 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518302 A-B) |
| v. | |
| JENNY R., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Carol Isakson, Judge.  Affirmed.

Katherine A. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Emily K. Harlan, Deputy County Counsel, for Plaintiff and Respondent.

Susan Lake, under appointment by the Court of Appeal, for Minors.

Jenny R. appeals a juvenile court judgment terminating her parental rights to her twin sons, B.R. and M.R., and choosing adoption as the preferred permanent plan. (Welf. & Inst. Code, § 366.26.)[1] Jenny challenges the sufficiency of the evidence to support the court's finding that the beneficial parent-child relationship exception to the adoption preference (§ 366.26, subd. (c)(1)(B)(i)) is inapplicable. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

B.R. and M.R. were born in 2007. In November 2011 the San Diego County Health and Human Services Agency (the Agency) took B.R. and M.R. into protective custody and filed petitions on their behalf under section 300, subdivision (b). Jenny had been taken to an emergency room after jumping out of her slowly moving car because "she got paranoid and began hallucinating that people were attacking her." She tested positive for methamphetamine. She was placed in a mental care facility on a 72-hour hold under section 5150.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

[2] To avoid repetition, we discuss Jenny's visitation with B.R. and M.R. and the nature of her relationship with them in the Discussion section of this opinion.

Jenny disclosed to the social worker that she began using methamphetamine at 16 years of age, and she used the drug during the first four and one-half months of her pregnancy with B.R. and M.R. She was clean until some point in 2008, after which she had a series of relapses, with the last one beginning in April 2011. She admitted she smoked the drug two to three times a day, on her patio when B.R. and M.R. were inside, and both she and her boyfriend drove under the influence with B.R. and M.R. in the car.[3] She believed she was a "better parent" when under the influence of methamphetamine.

Jenny was provided with a variety of reunification services for 18 months. She began an outpatient drug treatment program, and she was accepted into dependency drug court. In March 2011 she had achieved more than three months of sobriety, and she progressed from supervised to unsupervised visitation. The following May, however, supervised visitation resumed after she presented a "questionable urine sample," which was considered a positive test.

In August 2012, after more than three months of sobriety, the court ordered she have two unsupervised visits and one supervised visit per week. In October 2012, however, she admitted she had recently used methamphetamine on two occasions. She completed a support agreement in her drug treatment program, but stopped attending meetings and drug court because she began working full time. In November 2012 she was terminated from drug court, and the following month her visitation was modified to

3      B.R. and M.R.'s biological father, whose parental rights were also terminated, is not involved in this appeal.

3

supervised. By late January 2013, however, the Agency was again allowing unsupervised visits.

The 18-month review hearing was held in July 2013. Jenny had been out of contact with the social worker since the preceding February and she did not attend the hearing. Her drug treatment program reported she last attended a meeting in March 2013 and she was terminated from the program for nonattendance. She had met with a psychiatrist while in the program and reported "having a lot of negative thinking, suicidal ideation." She was "diagnosed with major depressive disorder and anxiety" and placed on medication. The court granted the Agency's request that Jenny's services be terminated and also granted its petition under section 388 to resume supervised visitation.

In its assessment report, the Agency recommended termination of parental rights and selection of adoption as the preferred permanent plan. The report stated both B.R. and M.R. are adoptable; they are healthy and well behaved. B.R. has a "pleasant personality," and M.R. "has a tendency to smile." The Agency identified their paternal aunt and her husband as the prospective adoptive home. Alternatively, there are 33 prospective adoptive families in San Diego County willing to adopt siblings with their characteristics.

A contested section 366.26 hearing was held on January 31, 2014. The Agency advised the court that earlier that month, Jenny had voluntarily enrolled in an outpatient drug program. The following day, however, she "did not show up at the program and

4

told them that she had relapsed again and that she needed a substance abuse residential program instead."

Jenny attended the hearing. She did not cross-examine the social worker or present any affirmative evidence. She cursorily argued for application of the beneficial parent-child exception to the adoption preference. The court found by clear and convincing evidence that B.R. and M.R. are adoptable and none of the statutory exceptions to adoption is applicable. The court terminated parental rights and found adoption to be in their best interests.

## DISCUSSION

## I

The sole issue on appeal is whether substantial evidence supports the court's finding the beneficial parent-child relationship exception to adoption is inapplicable. "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

Adoption is the Legislature's preferred permanent plan. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 573.) "Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision

(c)(1)."  (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.)  One of the exceptions applies if termination of parental rights would be detrimental to the child because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.36, subd. (c)(1)(B)(i).)

Jenny asserts she regularly visited B.R. and M.R. throughout the proceedings.  The Agency's reports, however, show she did not visit them between April 15, 2013, and the end of June 2013.  In late June, Jenny arrived about five hours late for their birthday party at the foster mother's home.  Jenny said she had been sleeping and just woke up.  She was crying and stayed for 30 minutes.  In July 2013 Jenny arrived early for a supervised visit at a park.  The social worker advised Jenny by telephone that B.R. and M.R. would be at the park in five minutes.  Jenny was unwilling to wait and insisted on rescheduling.

In September 2013 Jenny agreed that she and the social worker would coordinate visits and the social worker would supervise them as part of her assessment.  However, the social worker was later unable to contact Jenny because the telephone number she provided was disconnected.  Jenny arranged visits directly with the foster mother, who reported that her visitation was inconsistent in September and October 2013.  The social worker arranged a visit in November 2013, but that morning Jenny canceled it because her car had been stolen.  She refused to reschedule visitation until the car situation was resolved.

The only consistent contact with B.R. and M.R. after April 15, 2013, occurred during the last two weeks of December 2013. Jenny visited them on January 5, 2014, but about 10 days later she telephoned the foster mother to say she could not stay in touch with them because she was in a rehabilitation program. She did not contact them between January 5 and January 31, 2014, the date of the section 366.26 hearing.

"Regular visitation exists where the parents visit consistently and to the extent permitted by court orders." (*In re I.R.* (2014) 226 Cal.App.4th 201, 212.) "Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption." (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 554.) We conclude substantial evidence supports the court's finding of sporadic visitation. As the court explained, "Although the mother has had visitation throughout the course of the case, it has been fraught with interruptions and with relapses."

## II

Even had there been regular visitation we would affirm the court's ruling. To prevail on the second prong of the beneficial parent-child exception, a parent must show more than frequent and loving contact or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) This court has interpreted the phrase "benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)) to refer to a "parent-child" relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the

7

court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the *child would be greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, italics added.)[4]  The parent must show the child would suffer detriment if his or her relationship with the parent were terminated.  (*Ibid.*)

The Agency's assessment report states B.R. and M.R. "have a relationship with their mother," but they "have adjusted well living separately from [her] and according to the caregiver they no longer ask for her.  They refer to the caregiver sometimes as 'grandma' and other times as 'mom.'  [Their] separation from their mother has affected them but they have been able to adjust.  [They] no longer exhibit behaviors characterized as strong attachment with the mother.  They do not ask for the mother constantly, they do not cry from the separation from her, and do not appear anxious during the visit or the separation.  The current caregiver is . . . meeting their needs on a daily basis and the children seek their current caregiver for comfort and soothing."  The social worker

---

4       As we clarified in *In re Casey D.* (1999) 70 Cal.App.4th 38, 51, however, "[d]ay-to-day contact is not necessarily required, although it is typical in a parent-child relationship.  A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction."

believed that if parental rights were terminated, B.R. and M.R. "will suffer minimal or no detriment."

Jenny did not challenge the assessment report. She points out that B.R. and M.R. lived with her for the first four years of their lives. By the time of the section 366.26 hearing, however, they had not lived with her for more than two years. "The relevant question [is] the quality of the parent-child relationship at [the] time [of the section 366.26 hearing], given that they had been out of her custody for a lengthy period." (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 557.)

Jenny also relies on positive remarks from the Agency's reports. The foster mother reported in December 2013 that B.R. and M.R. were happy to speak with Jenny on the telephone, and at the beginning of a visit in a park they "ran toward her and gave her a hug," and she "hugged them and kissed them back." Jenny played with them appropriately. At the end of the visit they hugged and kissed goodbye, and B.R. asked if he could see her the next day.

At another visit in December 2013, B.R. and M.R. appeared happy to see their mother at a fast food restaurant. She had bought them food, and she was attentive while they ate. She praised them for bringing her drawings. She picked up M.R. and placed him on her lap, and he "leaned on [her] and rested his head on [her] chest." At the end of the visit, M.R. said, "I wish I could sleep over at my mom's house," and B.R. said, "I

wish I could go and live with my mom."  As the social worker drove away, B.R. looked back and waived to Jenny.

Jenny asserts B.R. and M.R. "would often ask when they would get to visit" her. She cites the Agency's May 2013 report, which actually shows they stopped asking for visits more than nine months before the section 366.26 hearing.  The report states that, according to the foster mother, they used to ask for visits, but after a visit on April 15, 2013, "they have not asked about the mother or having visits."

Further, Jenny asserts the Agency's assessment report states she, B.R. and M.R. had a "substantial relationship."  The page she cites, however, merely states "it seems that the children have a relationship with their mother."  The adjective "substantial" is not used, and the report indicates that any parent-child bond had eroded over the course of the proceedings.[5]

Additionally, Jenny asserts B.R. and M.R. "experienced sadness and loss when ending visits and returning to the caregiver's home," and "[t]his is the same detriment [they] would experience in severing [her] parental relationship."  She claims they suffered "emotional instability" and had a "sad demeanor after being separated from her."

---

[5]     The nature of the parent-child relationship before commencement of the dependency proceedings is unclear.  The paternal aunt reported to the Agency that "[d]uring the children's infancy, the mother would leave the children in the home of the paternal grandmother."  Jenny disclosed to the social worker that she and her boyfriend smoked methamphetamine on the patio while B.R. and M.R. were in the home, and other times she and the boyfriend "would alternate, as one would smoke methamphetamine while the other is inside watching the children and then they would switch."  B.R. and M.R. reported "there are times when they are left home alone."

She cites no evidence to support these statements. Expressing a desire to have an overnight visit or live with their mother, without more, is insufficient to show great harm or detriment.

We conclude substantial evidence supports the court's ruling. Although Jenny loves B.R. and M.R., and they have had pleasant visits, she points to no bonding study or other evidence suggesting that by the time of the section 366.26 hearing she had a parental role in their lives, that they would suffer any detriment on the termination of parental rights, or that the benefits of continuing the parental relationship outweighed the benefits of permanent placement with an adoptive family. (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 557; *In re Amber M.* (2002) 103 Cal.App.4th 681, 689-690 [mother met burden of showing beneficial parent-child relationship by presenting bonding study by a psychologist, and testimony of the CASA and a child therapist].)

As the court explained, B.R. and M.R. are entitled to stability and permanence and Jenny cannot provide it. At the time of the section 366.26 hearing she continued to struggle with sobriety and could not have any contact with them. "Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 854.)

11

DISPOSITION

The judgment is affirmed.


_____
McDONALD, J.

WE CONCUR:


_____
BENKE, Acting P. J.


_____
IRION, J.